## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TP GROUP-CI, INC,  )
    Plaintiff,  )
      )        Case No.  1:16-cv-00623-RGA
      )
IVAN VETECNIK,  )
    Defendant.  )

### REDACTED PUBLIC VERSION OF PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

This is a redacted public version of a document filed under seal on September 13, 2016.

Colm F. Connolly (#3151)
Jody C. Barillare (#5107)
**MORGAN, LEWIS & BOCKIUS LLP**
1007 N. Orange Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 574-3000
Facsimile: (302) 574-3001

OF COUNSEL:
Daniel D.  Rubinstein (*pro hac vice*)
William C. O'Neil (*pro hac vice*)
Michael A. Skokna (*pro hac vice*)
**WINSTON & STRAWN, LLP**
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

*Attorneys for Plaintiff TP Group-CI, Inc.*

Dated:  September 19, 2016

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TP GROUP-CI, INC, | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  1:16-cv-00623-RGA |
| | ) | |
| IVAN VETECNIK, | ) | |
| Defendant. | ) | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION FOR PRELIMINARY INJUNCTION

Colm F. Connolly (#3151)
Jody C. Barillare (#5107)
**MORGAN, LEWIS & BOCKIUS LLP**
1007 N. Orange Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 574-3000
Facsimile: (302) 574-3001

OF COUNSEL:
Daniel D.  Rubinstein (*pro hac vice*)
William C. O'Neil (*pro hac vice*)
Michael A. Skokna (*pro hac vice*)
**WINSTON & STRAWN, LLP**
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

*Attorneys for Plaintiff TP Group-CI, Inc.*

Dated:  September 13, 2016

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................1

        A.      TDOC and Koala Catheters ........................................................................1

        B.      Vetecnik's Employment at CI and Contractual Relationship with Plaintiff............3

        C.      Vetecnik's Unlawful Actions in Breach of the Stock Option Agreement ..............6

                1.      Smith Hired and Paid Vetecnik Thousands of Dollars Under the
                        Table to Build Machines for Smith to Use to Manufacture
                        Competing Catheters.............................................................................7

                2.      Vetecnik Leaked Confidential CI Information to Smith............................8

                3.      Vetecnik Was Aware that His Conduct Breached His Agreements ............9

        D.      CI Has Been and Will Continue to Be Harmed by Vetecnik's Conduct ..............10

III.    ARGUMENT .......................................................................................................10

        A.      Standard for Preliminary Injunctive Relief...................................................10

        B.      Plaintiff Has a Reasonable Likelihood of Success on the Merits of Its
                Claims ......................................................................................................11

                1.      Plaintiff is Likely to Prevail on its Non-Competition Claim (Count
                        I)......................................................................................................11

                        a.      Defendant Breached the Non-Compete Provision.........................11

                        b.      The Non-Compete Provision is Reasonable in Geographic
                                Scope and Temporal Duration .....................................................12

                        c.      The Non-Compete Provision Advances Plaintiff's
                                Legitimate Interests....................................................................14

                        d.      A Balancing of Equities Weighs in Favor of Enforcing the
                                Non-Compete Provision...............................................................14

                2.      Plaintiff is Likely to Prevail on Its Breach of Confidentiality Claim
                        (Count II) ..........................................................................................15

        C.      Plaintiff Will Suffer Irreparable Harm and Has No Adequate Remedy at
                Law ..........................................................................................................16

        D.      The Balance of Harms Favors Granting Plaintiff Injunctive Relief ....................18

        E.      The Public Interest Favors Issuing the Injunction Requested by Plaintiff...........19

IV.     RELIEF REQUESTED..........................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Homepatient, Inc. v. Collier,*
 2006 WL 1134170 (Del. Ch. Apr. 19, 2006) .........................................................................11

*Arch Pers. Care Prods., L.P. v. Malmstrom,*
 90 F. App'x 17 (3d Cir. 2003) ...............................................................................................19

*Burge v. City of Dover,*
 1987 WL 12311 (Del. Ch. June 8, 1987) ...............................................................................19

*Burton v. PFPC Worldwide, Inc.,*
 2003 WL 22682327 (Del. Ch. Aug. 4, 2003) .........................................................................19

*Del. Express Shuttle, Inc. v. Older,*
 2002 WL 31458243 (Del. Ch. Oct. 23, 2002) ........................................................................13

*Hough Assocs. v. Hill,*
 2007 WL 148751 (Del. Ch. Jan. 17, 2007).............................................................................16

*HR Staffing Consultants LLC v. Butts,*
 627 Fed. App'x 168 (3d Cir. 2015).........................................................................................19

*Kan-Di-Ki, LLC v. Suer,*
 2015 WL 4503210 (Del. Ch. July 22, 2015).....................................................................11, 14

*Kos Pharms., Inc. v. Ardx Corp.,*
 369 F.3d 700 (3d Cir. 2004)....................................................................................................10

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.,*
 68 A.3d 1208 (Del. 2012) .......................................................................................................16

*McCann Surveyors, Inc. v. Evans,*
 611 A.2d 1 (Del. Ch. 1987).....................................................................................................14

*Novartis Consumer Health, Inc. v. Johnson & Johnson—Merck Consumer Pharm.*
 *Co.,*
 290 F.3d 578 (3d Cir. 2002).............................................................................................17, 18

*Ortho Pharm. Corp. v. Amgen, Inc.,*
 882 F.2d 806 (3d Cir. 1989)....................................................................................................10

*Research & Trading Corp. v. Pfohl*,
   1992 WL 345465 (Del. Ch. Nov. 18, 1992) ........................................................... 13

*Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*,
   2015 WL 6611601 (Del. Ch. Oct. 30, 2015) ......................................................... 12

*Singh v. Batta Envtl. Assocs., Inc.*,
   2003 WL 21309115 (Del. Ch. May 21, 2003) ............................................... 12, 5, 19

*Tristate Courier & Carriage, Inc. v. Berryman*,
   2004 WL 835886 (Del. Ch. Apr. 15, 2004) ...................................................... 14, 17

*Vitalink Pharm. Servs., Inc. v. Manor Care, Inc.*,
   1997 WL 458494 (Del. Ch. Aug. 7, 1997) ............................................................. 16

*Weichert Co. of Pa. v. Young*,
   2007 WL 4372823 (Del. Ch. Dec. 7, 2007) ...................................................... 12, 13

I. **INTRODUCTION**

Plaintiff TP Group-CI, Inc. ("TP Group") the sole owner of Clinical Innovations ("CI") seeks preliminary injunctive relief to prevent further and irreparable harm to its business. As part of a scheme with one of CI's former owners[1], now-former CI engineer Defendant Ivan Vetecnik ("Vetecnik") broke his promises to TP Group by breaching his agreement not to compete with CI and to maintain the confidentiality of CI's information. In exchange for thousands of dollars, Vetecnik acted as an "inside man" by exploiting his position at CI to unlawfully and secretly steal information about CI's inventions and to utilize his specialized know-how (as well as CI's resources and machine shop) to help start a competing business. For the reasons set forth below, Vetecnik should be enjoined from further breaches of his agreements with Plaintiff.

II. **STATEMENT OF FACTS**

Plaintiff TP Group exists only to serve as the holding company for CI. CI is a healthcare company that, among other things, manufactures urinary catheters and catheters used during labor and delivery. (Ex. 1, McRoberts Aff., at ¶ 3.) CI's products are sold throughout the United States, as well as in 72 other countries. (*Id.* at ¶ 4.) CI was founded by three individuals, Steven Smith ("Smith"), William Dean Wallace, and Christopher Cutler. (*Id.* at ¶ 5.)

A. **TDOC and Koala Catheters**

CI manufactures two air-charged balloon catheters that are relevant to this case: the "Koala" and "TDOC" catheters. CI owns and manufactures the Koala intrauterine pressure catheter ("IUPC"), which it has been marketing since 1996. (*Id.* at ¶ 10.) Koala is one of CI's

---

[1] As noted in the Complaint, TP Group filed a separate action against Steven Smith and another former CI executive, Dean Wallace, in the United State District Court for the Northern District of Illinois relating to conduct alleged in this complaint, due to a venue clause in those individuals' agreements.

most important and profitable products, representing approximately ██████████████ ████████████████████████ (*Id.* at ¶ 9.)

The TDOC pressure-sensing catheters were developed by CI, utilizing the innovative air-charged design feature of the Koala catheter. (*Id.* at ¶ 12.) The TDOC-style catheter is similar in design to Koala, but it utilizes multiple balloons and has urological, gastroenterological, and other applications. (*Id.*) Koala and TDOC both have four primary components: (1) a piece of tubing; (2) a balloon; (3) a reusable monitor cables; and (4) a connector. (*Id.* at ¶ 7.)

The Koala IUPC has unique and proprietary features that distinguish it from other intrauterine catheters. (*Id.* at ¶ 9.) For example, Koala is the only IUPC currently on the market that has no electronic components in the catheter itself. (*Id.*) One benefit of this design feature is that Koala has a smaller and softer tip than other catheter products, which helps reduce the risk of injury, facilitates proper placement, and increases comfort for the mother and baby. (*Id.*) Koala also uses proprietary air-coupling technology to measure pressure. (*Id.* at ¶ 10.) By comparison, other intrauterine catheters use an electronic sensor tip instead of a charged column of air in the tubing. (*Id.*) Using sensors can create complications when a patient moves because amniotic fluid levels may change as a result. (*Id.*) Thus, Koala's use of the charged column of air and lack of electronics in the catheter give it a competitive advantage over other IUPCs. (*Id.*)

CI has designed and built specialized versions of machines that have been specifically designed to manufacture its specific catheter products and incorporate technique and methods which CI had as honed to make that process efficient and effective. ██████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

2



**B.      Vetecnik's Employment at CI and Contractual Relationship with Plaintiff**

From the early 2000s until his termination on June 14, 2016, CI employed Vetecnik as a full-time engineer. (Ex. 2 ¶ 14.) Vetecnik was responsible for identifying and repairing problems that arose in CI's manufacturing lines. Vetecnik built a number of the specialized machines used in the manufacturing line for TDOC and some machines used to manufacture Koala, which have been designed and developed to specifically meet CI's particular needs. (*Id.* at ¶ 16.) Vetecnik has unique knowledge about some of CI's machines that no other employee at CI has because, for example, Vetecnik made modifications to those machines without documenting his work. (*Id.* at ¶ 18.) Vetecnik played a critical role in designing, building, and setting up machines███████████████████████████████████████████████ (*Id.*)

On January 10, 2011, Vetecnik entered into Stock Option Agreement with TP Group. Pursuant to the agreement, Vetecnik was given the option to purchase Option Shares in CI for a

---

2 ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

set price per share. (Ex. 3 at p. 19.) In exchange for the stock option, Vetecnik made certain promises to TP Group.

The Stock Option Agreement contained a non-competition provision ("Non-Compete Provision"). The clause provided, in relevant part:

> 10.    Noncompetition.    You acknowledge that in the course of your employment . . . you have become and shall become familiar with trade secrets . . . and with other Confidential Information . . . and that your services have been and shall be of special, unique and extraordinary value to the Company and its Subsidiaries. Therefore, . . . you agree that during the Employment Period until the second anniversary of the Termination Date . . . you shall not, . . . engage or participate (whether as an owner, operator, partner, member, shareholder, manager (including as a manager of personal and family investments), directly or indirectly in the Business or any other business competing with the businesses of the Company or any of its Subsidiaries, as such businesses are conducted or are proposed to be conducted during the Employment Period anywhere in the world.

(*Id.* at § 10.)[3]

For the purpose of the Non-Compete Provision, the "Business" was defined to "mean the businesses conducted by the Company, its Subsidiaries and Affiliates at any time during the Employment Period and shall include the design and manufacture of medical devices used in the fields of women's and infant's health, urology and gastroenterology." (*Id.* at p. 1.) The "Employment Period" "means the period beginning on the date hereof and ending on the Termination Date." (*Id.*) The parties agreed that in the event of a breach, "the Noncompete Period [] shall be tolled until such breach or violation has been duly cured." (*Id.* at § 12(b).)

In exchange for the stock option, Vetecnik also agreed to maintain the confidentiality of CI's information. Confidential Information was defined broadly to include, in relevant part:

> (a)    Obligation to Maintain Confidentiality. . . . Confidential Information will be interpreted as broadly as possible to include confidential information of any

---

[3]    According to the terms of the Stock Option Agreement, the non-competition clause was in effect for the duration of Vetecnik's employment with CI and (unless tolled according to Paragraph 12) will remain in effect until June 14, 2018. See Ex. 3 § 12.

sort (whether merely remembered or embodied in a tangible or intangible form) . . .. Confidential Information includes, without specific limitation, the confidential information, observations and data in obtained by you during the course of your performance under this Agreement or prior to the date hereof concerning the business and affairs of the Company . . .

(*Id.* at § 9(a).)

Vetecnik also agreed that he would not disclose any Confidential Information without "the Board's prior written consent." (*Id.*) Furthermore, he agreed not to "disclose [Confidential Information] to any unauthorized person or use for any person's account." (*Id.*) Unlike the Non-Compete Provision, Vetecnik's obligation not to disclose Confidential Information does not have an end date and thus his obligation remained in force unless and until the information was made public by TP Group or Vetecnik was required to disclose it by law or court order. (*Id.*) Vetecnik also acknowledged "that all information, observations and data (including trade secrets) obtained by you during the Employment Period" was the property of CI. (*Id.* at § 9(a).)

In connection with the Non-Compete Provision and the confidentiality clause, the Stock Option Agreement also specifically provided TP Group the right to seek injunctive relief in the event of Vetecnik's breach. Specifically, "in the event of a breach of . . . Sections 9 through 11, each of the Company, its Affiliates and their successors or assigns may . . . receive from any court of competent jurisdiction a remedy of specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions . . .." (*Id.* § 12(b).)

Vetecnik also made a series of acknowledgements in connection with the enforcement provision of the Stock Option Agreement. Vetecnik acknowledged that:

> (i) the **terms and conditions of _Sections 9_ through _11_** (A) are, in light of the circumstances, **_fair and reasonable as to type, scope and period of time_**, and are reasonably required for the protection of the Company and its Subsidiaries and the goodwill associated with the Business, (B) are designed to eliminate competition which otherwise would be unfair to the Company and its Subsidiaries, (C) **_do not stifle your inherent skill and experience_**, (D) **_would_**

*not operate as a bar to your sole means of support*, (E) are fully required to protect the legitimate interests of the Company and its Subsidiaries, (F) do not confer a benefit upon the Company and its Subsidiaries disproportionately to your detriment or the benefits afforded you by this Agreement and (G) are necessary to protect the business interests of Company, its Subsidiaries and their businesses, officers, directors and employees[;]

(ii) the *Company and its Subsidiaries have extensive trade secrets and other confidential information with which you have become familiar* as a necessary component of your involvement with the Company and its Subsidiaries[;]

(iii) you will have such *sufficient knowledge of Company's and its Subsidiaries['] trade secrets and other confidential information that, if you were to compete* with Company and its Subsidiaries during the Noncompete Period, *you would inevitably rely (consciously or unconsciously) on such trade secrets and other confidential information causing irreparable harm to the Company and its Subsidiaries.*

(*Id.* at § 12(a) (emphasis added).)

## C.    Vetecnik's Unlawful Actions in Breach of the Stock Option Agreement

During his employment at CI, and in violation of the promises made in the Stock Option Agreement, Vetecnik brazenly, secretly and unlawfully stole, disclosed and utilized CI's confidential information and know-how about TDOC and Koala to aid former CI employee Smith's direct competition with CI's catheter business. Stated differently, as detailed below, Vetecnik was Smith's "inside man." Vetecnik not only leaked confidential information to Smith, but he also secretly used his specialized knowledge—obtained during his longtime work for CI on TDOC and Koala—to build (for a profit) machines for Smith's use in manufacturing competitive catheter products. Worse yet, he did so by working nights and weekend in *CI's machine shop* and *utilizing CI's equipment* to do so. As detailed below, Vetecnik's covert efforts to help Smith are evidenced by numerous contemporaneous emails authored by Vetecnik himself (sent while Vetecnik was employed by CI using his CI email account), as well as through materials discovered in Vetecnik's CI cubicle and on his CI computers.

6

1.    <u>Smith Hired and Paid Vetecnik Thousands of Dollars Under the Table to</u>
       <u>Build Machines for Smith to Use to Manufacture Competing Catheters</u>

The extent of Vetecnik's work designing and building machines for Smith's competitive

venture, and the thousands of dollars he was paid to do so, is well-documented in Vetecnik's

emails.[4]  For example:

- On July 31, 2014, Vetecnik emailed a friend about an offer to work for Smith's new company and said: "And this man is slowly starting a similar company. He wants me to become his partner. So far I am making a production line here under the table for him so that he could start right away. It is approximately ten devices of different complexity that I am making and selling them to him. 5 thousand a piece on average." (Ex. 4.)

- On October 17, 2014, Vetecnik emailed Smith about a machine that Vetecnik built for use in catheter manufacturing. Vetecnik provided Smith with information about the cost of the machine. Smith and Vetecnik then secretly met in a Lowe's parking lot to exchange money and the machine. (Ex. 2 ¶ 49; *id.* at Exs. S, T.)

- On October 30, 2015, Vetecnik emailed a friend and said: "I built all the machines that he'll need for production last year, he paid me good money for that." (Ex. 5.)

- On December 19, 2015, Vetecnik emailed a friend and said: "So I'll continue making some devices for them here at nights, roughly for 40 thousand a year, before I kick the bucket." (Ex. 6.)

- On January 9, 2015, Vetecnik wrote: "I have made six important machines for production for him already this year." (Ex. 7.)

Consistent with these emails, prior to his termination from CI, Vetecnik admitted to CI

engineer Brandon Moon that he had been working for Smith for over a year and that Smith was

working to design, develop, and manufacture "all of the same catheters as CI, including Koala."

(Ex. 2 ¶¶ 20, 23.)  Vetecnik also told Moon that Smith was working on an improved version of

CI's Koala catheter, ████████████████████████████████ (*Id.* at ¶ 24.)

---

[4]    All of the emails quoted in this Complaint that were sent by Vetecnik were recovered from Vetecnik's CI email account.  Some of those emails were written in the Czech language.  Such emails, as set forth herein, have been translated into English by a certified translator.

Additional evidence showing the specific types of machines Vetecnik built for Smith was discovered on two CI laptops Vetecnik used. For example:

- invoices to Smith for two different machines used in catheter manufacturing (a printer and ▇▇▇ (*Id.* at ¶¶ 50-51; *id.* at Exs. U, W.);

- numerous photographs of an assembled ▇▇▇ drill machine nearly identical to that used by CI (*Id.* ¶ 46; *id.* at Exs. N-R); and

- code to program a ▇▇▇ welder machine, not related to any CI work (*Id.* at ¶ 47.)

Furthermore, the following items that do not relate to work CI tasked Vetecnik with—but which relate to the design and/or manufacture of catheters—were found in Vetecnik's cubicle: (1) drawings of machines designed to work with a catheter product that uses Koala's connector; (2) catheter tubing consistent with TDOC and/or Koala; (3) calculations and a drawing related to a laser machine, which is a machine used by CI to manufacture catheters; and (4) numerous component parts and drawings for a balloon blowing machine, an essential machine used to manufacture both Koala and TDOC. (See Ex. 2 ¶¶ 31-37, 42-43, 45, 52.) Additional evidence of Vetecnik designing and building machines to manufacture catheters like Koala and TDOC for an entity other than CI, including explanations of numerous drawings and machine component parts found in Vetecnik's cubicle, is detailed in the Affidavit of Brandon Moon. (*See* Ex. 2.)

2.    Vetecnik Leaked Confidential CI Information to Smith

In addition to his work building machines for Smith, Vetecnik leaked to Smith CI's confidential information. For example:

- On February 3, 2014, Vetecnik sent Smith detailed, specific, and confidential instructions about building a specific ▇▇▇ machine CI uses that would allow Smith to replicate the CI machine's key functionality and design.[5] (Ex. 2 ¶ 51; *id.* at Ex. X);

---

[5]     A splitter is a machine that CI uses as part of the TDOC manufacturing process. The splitter splits multiple lumens in the tubing, which makes them accessible for further processing. (Ex. 2 ¶ 51.)

- On June 23, 2014 Vetecnik emailed Smith information about a machine used to weld balloons onto catheters and described the techniques CI uses. (Ex. 2 ¶ 44; *id.* at Ex. K);

- On June 26, 2014, Vetecnik emailed Smith about a catheter that Smith was designing ████████████████████████████████ Vetecnik sent Smith design specifications for the product and information about welding solutions, including a reference to a non-obvious technique that CI developed and utilizes. (Ex. 2 ¶ 44; *id.* at Ex. H);

- On July 9, 2014, Vetecnik sent to Smith the balloon dimensions for CI's TDOC catheter. (Ex. 2 ¶ 39; *id.* at Ex. G).

    3.    Vetecnik Was Aware that His Conduct Breached His Agreements

The evidence overwhelmingly demonstrates the secret nature of Vetecnik's work for Smith as well as his recognition that such work violated the Non-Compete Provision and confidentiality provision in the Stock Option Agreement with TP Group. For example:

- On July 13, 2014, Vetecnik emailed a friend: "***So that is part of my Saturday. I will be able to devote the rest (after midnight) to completing two devices that I am making illicitly at work for this start-up company***. We are founding it together with one of the former owners of this company . . .. [H]e wants to start doing pretty must [sic] the same, but a bit improved. However, he needs me to do that because I am invented all these production lines here and I make them with 'these hands.' *So we have to meet secretly because the five year period will over only in January. But until then, he is buying from me the equipment for his production so that he can start immediately*." (Ex. 8) (emphasis added.)

- On November 19, 2014, Vetecnik told a friend about potentially leaving CI to work with Smith: "If anything, I'll work with [Smith] *under the table but that could result in a serious conflict of interest* since *one of his products will be very similar to the product we produce* here." (Ex. 9) (emphasis added.)

- On December 19, 2015, Vetecnik stated: "For almost a year, I've been preparing in secret a new company, which will basically be *a direct competitor to our firm*." (Ex. 6) (emphasis added.) He also explained his integral role with Smith's new company: "I was a key player, because I had designed 90% of those products myself, and then later I also manufactured the production lines for them with the varying complexity of automation." (*Id.*)

CI building keycard records show extensive activity by Vetecnik on nights and weekends. (Ex. 10, Sebastian Jakins Aff., ¶ 15; *id.* at Ex. A.) Observations by two of CI's machine shop

employees, as well as surveillance video from CI's machine shop, also show that Vetecnik used CI's machine shop to build machines for Smith when no other employees were around. (Ex. 11, Arlund Lewis II Aff., ¶ 7; Ex. 12, Arlund Lewis III, ¶ 5; Ex. 2 ¶ 53.) Vetecnik's secret work for Smith continued until June 2016, when it was discovered by CI. (Ex. 1 ¶ 24; Ex. 2 ¶ 29.) CI then undertook an emergency internal investigation. On June 14, 2016, CI terminated Vetecnik.

### D. CI Has Been and Will Continue to Be Harmed by Vetecnik's Conduct

Some of the harm CI will suffer from Vetecnik's conduct regarding TDOC has already become apparent (although the scope and collateral impact on CI's R&D and overall business are unknown, and will be difficult to calculate). More specifically, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇ (*Id.* at ¶ 23.) This harm, and the additional harm CI may suffer relating to Smith entering the intrauterine catheter market with a product based on Koala and utilizing machines built using Vetecnik's know-how and incorporating proven CI methods, are discussed below in Section C.

## III. ARGUMENT

### A. Standard for Preliminary Injunctive Relief

Preserving the status quo is "the goal of preliminary injunctive relief in any litigation." *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989). To obtain a motion for preliminary injunction, a party must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Ardx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

**B.      Plaintiff Has a Reasonable Likelihood of Success on the Merits of Its Claims**

1.      Plaintiff is Likely to Prevail on its Non-Competition Claim (Count I)

Plaintiff is likely to prevail on the merits on the non-competition claim because, as set forth above, there is ample evidence of Vetecnik's breaches. "To be enforceable [under Delaware law], a covenant not to compete must (1) meet general contract law requirements,[6] (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities." *Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *2 (Del. Ch. Apr. 19, 2006).

a.      *Defendant Breached the Non-Compete Provision*

In his Stock Option Agreement, Defendant Vetecnik made the following promises:

- He "shall not, . . . engage or participate (whether as an owner, operator, partner, member, shareholder, manager (including as a manager of personal and family investments, employee, officer, director, consultant, advisor, representative, contractor or otherwise), directly or indirectly in the Business or any other business competing with the businesses of the Company or any of its Subsidiaries, as such businesses are conducted or are proposed to be conducted during the Employment Period anywhere in the world. . . ."

- The Business was defined as "the businesses conducted by the Company, its Subsidiaries and Affiliates at any time during the Employment Period and shall include the design and manufacture of medical devices used in the fields of women's and infant's health, urology and gastroenterology."

(Ex. 3 at § 10.)  The Non-Compete Provision remained in effect for the period of Vetecnik's employment at CI and for two years thereafter (i.e. two years—from June 14, 2016 until June 14, 2018), except in the event of a breach that tolls the restrictive period until the "breach or violation has been duly cured." (*Id.* at § 12.)

---

[6]      Under Delaware law, "[t]o prove a breach of contract . . ., [a plaintiff] must show: (1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damages." *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015).

11

The evidence is clear and convincing that Vetecnik breached the Non-Competition Provision. First, Vetecnik admitted that while in the employ of CI, he and Smith planned to found a new company that would "be a direct competitor to [CI]" and that would a product that "will be very similar to the product [CI] produce[s] . . .." (Exs. 9, 10.) Second, to further his secret scheme with Smith, in exchange for thousands of dollars, Vetecnik built machines for Smith to use in the manufacturing process. In fact, according to Vetecnik himself, "[he] built ***all*** the machines that [Smith will] need for production." (Ex. 5) (emphasis added).

> b.    *The Non-Compete Provision is Reasonable in Geographic Scope and Temporal Duration*

The Non-Compete Provision is confined to the term of Vetecnik's employment at CI, plus two years, and prohibits competition anywhere that CI conducts business. (Ex. 3 at § 10.) Because these provisions are reasonably limited and are what Vetecnik agreed to in exchange for something of substantial value—the award of a stock option—they should be enforced. Indeed, Delaware law provides parties to a contract wide latitude to determine the geographic scope and temporal duration of restrictive covenants. *See, e.g.*, *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *10 (Del. Ch. Oct. 30, 2015) ("[W]here restrictive covenants are carefully negotiated, our law requires that the unambiguous terms be given effect.") Vetecnik himself also agreed that the scope and duration of the non-competition provision are reasonable and he should not now be permitted to argue otherwise. (*See* Ex. 3 at § 12(a)(i).)

Moreover, Delaware courts have repeatedly upheld restrictive covenants of two or more years as reasonable. *See Weichert Co. of Pa. v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) (collecting cases); *Singh v. Batta Envtl. Assocs., Inc.*, 2003 WL 21309115, at *2 (Del. Ch. May 21, 2003) (enforcing a two-year non-compete clause). Vetecnik's restrictions are also reasonable because they are directly limited to the areas in which CI does business. (*See* Ex. 3 at

§ 10 (restricting competition in the "businesses conducted by the Company, its Subsidiaries and Affiliates at any time during the Employment Period [including] the design and manufacture of medical devices used in the fields of women's and infant's health, urology and gastroenterology.").) Vetecnik's specialized knowledge of CI's confidential and proprietary information and his extensive knowledge of the manufacturing operations also warrant the enforcement of the Non-Compete Provision to prevent him from working in any capacity for a competitor who does business in the areas CI operates.  His intimate knowledge of CI's products and processes make enforcement a critical to protecting CI's place in the market and competitive advantage.

Furthermore, the geographic scope here is merely what "is necessary to protect a party's legitimate interests." *Weichert*, 2007 WL 4372823, at *3.  Indeed, Vetecnik—particularly with his particular knowledge about CI's products and processes—can unfairly harm CI anywhere CI does business; thus the geographic scope of the Non-Competition Provision is defined by where CI conducts business.[7]  *See id.* ("Thus, the reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect.").  Delaware courts routinely find reasonable restrictive covenants with geographic areas extending to a business's entire market area. *See, e.g., Del. Express Shuttle, Inc.* v. *Older*, 2002 WL 31458243, at *12 (Del. Ch. Oct. 23, 2002) (enforcing non-competition agreement and prohibiting defendant from competing in geographical area served by plaintiff); *Research & Trading Corp. v. Pfohl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) (upholding non-competition agreement with geographic restriction tied to employer's entire market or customer base).

---

[7]    It should be noted that all of Vetecnik's alleged competition happened in CI's backyard—namely, with entities in Salt Lake City, Utah and utilizing CI's own facilities.

13

        c.      *The Non-Compete Provision Advances Plaintiff's Legitimate*
               *Interests*

The Non-Compete Provision advances Plaintiff's legitimate interest in protecting CI's goodwill in the market for medical devices used in the fields of women's and infant's health, urology, and gastroenterology. *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015) (finding that "legitimate interests" that warrant the enforcement of restrictive covenants "include protection of employer goodwill, and protection of employer confidential information from misuse"); *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004) ("[P]rotect[ing] the goodwill of . . . clients and . . . confidential information . . . have long been recognized as legitimate economic interests").

In this case, there is no question that Plaintiff has a legitimate interest in seeking to protect the goodwill of CI. Moreover, Vetecnik himself acknowledged that the non-competition provision served to protect Plaintiff's "legitimate business interests" and the court should thus not entertain any argument to the contrary. (Ex. 3 at § 12(a)(v).)

        d.      *A Balancing of Equities Weighs in Favor of Enforcing the Non-*
               *Compete Provision*

A balancing of the equities weighs in favor of enforcing the Non-Compete Provision in this case to protect CI's business and confidential information. Under Delaware law, "where valuable trade secret or other proprietary information has been learned by the defendant and, therefore, his competition with plaintiff's business may be particularly effective and unfair, the contractual provision not to compete is more likely to be specifically enforced." *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 4 (Del. Ch. 1987). Vetecnik is a highly-skilled engineer with extensive knowledge of CI's confidential information and proprietary manufacturing processes which must be protected in order to preserve CI's competitive advantage in the medical device field. The evidence demonstrates that Vetecnik disregarded his promises, which

he made in exchange for valuable consideration, and has put CI's business at risk. He must be held to his promises to prevent further irreparable harm.

Furthermore, restrictive covenants, like the one at issue here, are not oppressive if a former employee has a means of financial support during the non-compete period. Here, Vetecnik can work as an engineer on other medical devices, just not those used in the fields of women's and infants' health, urology and gastroenterology. *See Singh v. Batta Envtl. Assocs., Inc.*, 2003 WL 21309115, at *9 (Del. Ch. May 21, 2003) (finding it reasonable to limit the scope of the defendant's potential job options). Therefore, the equities weigh in favor of enforcement.

        2.      <u>Plaintiff is Likely to Prevail on Its Breach of Confidentiality Claim (Count II)</u>

Plaintiff is also likely to prevail on its breach of confidentiality claim. Like the Non-Compete Provision, the confidentiality provision is enforceable as a matter of law and injunctive relief should issue to prevent any further breach by Vetecnik.

As discussed above, there is clear and convincing evidence that Vetecnik violated his confidentiality agreement with Plaintiff. For example, Vetecnik breached the agreement by sending to Smith, among other things, detailed information about building a specific, specialized machine CI uses called a ███████, information about a non-obvious technique CI developed and uses in its ████ welder machine, and product dimensions.

Furthermore, there is a presumption that he utilized CI's confidential information when he breached the Non-Competition Provision in the ways detailed above. In the Stock Option Agreement, Vetecnik acknowledged that because of his "sufficient knowledge of Company's and its Subsidiaries['] trade secrets and other confidential information," if he competes with CI during his non-compete period, he "would inevitably rely (consciously or unconsciously) on such trade secrets and other confidential information causing irreparable harm to the Company

15

and its Subsidiaries." (Ex. 3 at § 12(a)(iv).) Stated differently, Vetecnik inevitably relied on confidential CI information and know-how to build the numerous catheter manufacturing machines he sold to Smith and to otherwise aid Smith. This fact is bolstered by Vetecnik's drawings and photographs, that, as discussed above, appear similar, if not identical, to CI machines and designs. Because Plaintiff has demonstrated that Vetecnik violated the Non-Competition Provision, a presumption arises that he did so by utilizing CI's confidential information.

### C.    Plaintiff Will Suffer Irreparable Harm and Has No Adequate Remedy at Law

Plaintiff is incurring, and will continue to incur irreparable harm if Vetecnik is allowed to further breach his contractual duties to Plaintiff. As a threshold matter, Vetecnik acknowledged in the Stock Option Agreement that he would "invariably rely" on CI's confidential information if he breached the non-competition agreement, thereby "causing irreparable harm." (*Id.*) In Sections 12(b) and 17, Vetecnik also specifically agreed that money damages would not be an adequate remedy in the event of a breach by him and that injunctive relief should be granted in favor of Plaintiff to prevent breaches. Delaware law permits parties to "agree[ ] that breaches of their contracts will create irreparable harm and should be remedied by injunctive relief." *Hough Assocs.*, 2007 WL 148751, at *18. Such a stipulation "alone suffices to establish the element of irreparable harm" supporting injunctive relief, and the breaching party "cannot be heard to contend otherwise." *Vitalink Pharm. Servs., Inc. v. Manor Care, Inc.*, 1997 WL 458494, at *9 (Del. Ch. Aug. 7, 1997); *see also Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012) ("Our courts have long held that contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing injunctive

16

relief." (internal quotations omitted).)  Plaintiff has thus adequately demonstrated irreparable harm.

Contractual acknowledgements aside, the evidence shows that Plaintiff will suffer irreparable harm if a preliminary injunction is not awarded.  Under Delaware law, "[t]he harms resulting from competition by someone bound by a noncompetition agreement are frequently found to be irreparable."  *Tristate Courier*, 2004 WL 835886, at *13 n. 147.  In the medical device business, a "significant amount of CI's value stems from the unique features of its products as well as the manufacturing techniques it has developed and honed for specific products."  (Ex. 1 ¶ 40.)  "If someone was to employ that information to design and manufacture similar or competitive catheters, that person would have a significant leg-up by avoiding the cost and time it takes to create and perfect methods and techniques that help decrease CI's costs and provide it with competitive advantages."  (*Id.*)  Indeed, Vetecnik himself acknowledged that the value of CI's trade secrets and confidential information "arises from the fact that such information is not generally known in the marketplace."  (Ex. 3 at § 12(a)(iii).)  Thus, Vetecnik's disclosure of confidential information and the use of his specialized know-how about catheter products to aid Smith has harmed and will continue to harm CI by undermining its competitive advantage in the marketplace.  (Ex. 1 ¶ 42.)

There is also evidence that, with Vetecnik's help, Smith has harmed CI's business with its customers.  *See Novartis Consumer Health, Inc. v. Johnson & Johnson—Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("loss of market share is a potential harm which cannot be redressed by a legal or an equitable remedy following a trial.").  ███████████

███████████████████████████████████████████████

███████████████████████████████  (Ex. 1 ¶ 23.)  ███████████████

17

████████████████████████████████████████████████████ CI would also lose the "significant capital and resources" expended to set up ███████████ (*Id.*)

Additionally, based on Vetecnik's statements and evidence recovered from his cubicle, Smith, with Vetecnik's aid, is making a new version of CI's Koala catheter that can be manufactured at a lower cost. As explained by CI's Vice President of Operations: "[I]f a company was to sell an improved version of Koala at a lower price, it would undermine CI's market share and could even price CI out of the market entirely as it would take CI time and resources to change its manufacturing processes to utilize [the cheaper production] method and to get those processes qualified under Food and Drug Administration regulations. (Ex. 1 ¶ 41.) Such an outcome would be dire for CI because Koala constitutes ███████████████████████ ████████████████████ (*Id.* at ¶ 9). The loss of revenue CI would suffer both by losing market share in the intrauterine pressure catheter market and losing TDOC manufacturing would also irreparably harm its overall business strategy and ability to continue to invest in research and development to improve current products or invent new products which would improve labor and delivery, on top of requiring CI to terminate tens of employees.

**D.    The Balance of Harms Favors Granting Plaintiff Injunctive Relief**

"Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis*, 290 F.3d at 596. Here, the potential injury to Plaintiff if an injunction is not issued far outweighs any harm to Vetecnik if the injunction is issued. If Vetecnik is allowed to further breach his promises to Plaintiff, TP Group stands to lose its competitive advantage and share in the catheter products market. In contrast, Vetecnik will suffer no harm at all and he will simply be required to comply with the terms of his agreement with Plaintiff that he made in exchange for stock options. Furthermore, "[t]o lose

18

one's salary is a blow to any working person, but it is not ordinarily a blow that is legally irreparable." *Burge v. City of Dover*, 1987 WL 12311, at *10 (Del. Ch. June 8, 1987) (citing *Sampson v. Murray*, 415 U.S. 61, 89-92 (1974)); *see also Burton v. PFPC Worldwide, Inc.*, 2003 WL 22682327, at *4 (Del. Ch. Aug. 4, 2003) (argument that employee could not pay health insurance premiums is not sufficient irreparable harm deny enforcement of restrictive covenants). A party must show "more than simply the loss of money and what it can buy, but will suffer further specific consequences that the law would regard as irreparable." *Id.*

Vetecnik received a substantial salary for years and years from CI. In 2011, he was also invited to enter into the Stock Option Agreement with Plaintiff, which he redeemed ████████ ████████ (Ex. 3.) While at CI, Vetecnik became Smith's mole and received thousands and thousands of dollars in under-the-table payments from Smith. The Non-Compete Provision does not prevent Vetecnik from continuing to work as an engineer. According to the terms of the Stock Option Agreement, Vetecnik is free to work on medical devices as long as those devices are not "used in the fields of women's and infant's health, urology and gastroenterology." Furthermore, the fact that Vetecnik may be unable to work for a time does not outweigh the harm that Plaintiff will incur absent a preliminary injunction. *See Singh*, 2003 WL 21309115, at *9 (finding that it "was not unreasonable to require [defendant] to choose between (i) reducing the scope of his environmental business to comply with the noncompetition provision, or (ii) working in a different field in which he is adequately trained (i.e. engineering), or (iii) simply waiting until the noncompetition period expires").

### E.      The Public Interest Favors Issuing the Injunction Requested by Plaintiff

"[T]he public at large can be expected to gain from the enforcement of non-competes . . .." *HR Staffing Consultants LLC v. Butts*, 627 Fed. App'x 168, 175 (3d Cir. 2015); *see also Arch Pers. Care Prods., L.P. v. Malmstrom*, 90 F. App'x 17, 21 (3d Cir. 2003) (affirming district

court's conclusion that non-competition "restraints were within the public's interest in the enforcement of contracts according to the terms included by the parties."). Accordingly, the public interest factor weighs in favor of issuing a preliminary injunction in this case.

## IV.   RELIEF REQUESTED

For the reasons set forth above, to hold Vetecnik to his promises and to prevent irreparable harm to Plaintiff, TP Group respectfully requests that this Court grant its Motion for Preliminary Injunction and sign the Revised Proposed Order (Ex. 13) granting the relief requested therein.

Date: September 13, 2016                         MORGAN, LEWIS & BOCKIUS LLP

                                                 */s/ Jody C. Barillare*
                                                 Colm F. Connolly (#3151)
                                                 Jody C. Barillare (#5107)
                                                 1007 N. Orange Street, Suite 501
                                                 Wilmington, Delaware 19801
                                                 Telephone: (302) 574-3000
                                                 Facsimile: (302) 574-3001

                                                 OF COUNSEL:
                                                 Daniel D. Rubinstein (*pro hac vice*)
                                                 William C. O'Neil (*pro hac vice*)
                                                 Michael A. Skokna (*pro hac vice*)
                                                 WINSTON & STRAWN, LLP
                                                 35 West Wacker Drive
                                                 Chicago, Illinois 60601
                                                 Telephone: (312) 558-5600
                                                 Facsimile: (312) 558-5700

                                                 *Attorneys for Plaintiff TP Group-CI, Inc.*